IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DONNA MARIE KALMUS, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 1:15-cv-316-RP |
| | § | |
| JEANETTE ZIMMERMANN, et al., | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before the Court are Defendant Laura Moore's Motion to Dismiss, filed July 8, 2016, (Dkt. 30); Defendant Laura Moore's No Evidence Motion for Summary Judgment, filed July 8, 2016, (Dkt. 31); Defendants Jeanette Zimmermann[1], Karin Harbers, Jessica Jackson, and Kelli Sandoval's Motion for Summary Judgment on the Basis of Qualified Immunity, filed July 8, 2016, (Dkt. 33); and Plaintiffs' Second Motion for Leave to Amend Complaint, filed August 12, 2016, (Dkt. 42). Having considered the pleadings and the relevant law, the Court issues the following order.

## I. Background

This case involves the removal of an infant child from her family's home by the Texas Department of Family and Protective Services ("TDFPS" or "the Department"). Plaintiffs Donnie Marie Kalmus and Jarvis Deshawn Burns assert claims, pursuant to 42 U.S.C. § 1983, against four TDFPS employees and one Court Appointed Special Advocate, for violations of their constitutional

---

[1] The Court is unsure how to spell this Defendant's last name. Defendants' counsel consistently spells the name "Zimmerman." However, Jeanette's declaration is labeled "Declaration of Jeanette Zimmermann," (Dkt. 33-2 at 1), and is signed "Jeanette Zimmermann," (*id.* at 5). Accordingly, contrary to all of the other filings in the case, the Court adopts "Zimmermann" as the appropriate spelling. Similarly, Defendants' counsel generally spells Ms. Sandoval's last name "Kelly," whereas her declaration indicates her name is spelled "Kelli." Again, the Court adopts the spelling found in the Defendant's declaration.

rights and the constitutional rights of their children, F.K. and K.R.B.[2] The facts of the case are largely undisputed.

Kalmus and Burns have a history of involvement with TDFPS dating back to 2010. In November 2010, the Department received a report indicating Kalmus and Burns had engaged in domestic violence in the presence of F.K. In early 2011, the Department received another report that included further allegations of domestic violence by Burns, as well as allegations of extensive drug use by both Burns and Kalmus. The report also included an allegation that Burns and Kalmus would regularly lock F.K. in their car, while they used drugs and had sex in their trailer. At the time, no action was taken to remove F.K. from the home.

In January 2012, undercover officers with the Fayette County Narcotics Unit repeatedly purchased narcotics at the home where Burns, Kalmus and F.K. were known to reside. The unit then executed a search warrant at the residence and found methamphetamines and drug paraphernalia in the same room where a child appeared to live. The Fayette County Narcotics Unit alerted TDFPS to the conditions at the residence, and TDFPS initiated an investigation. On January 17, 2012, TDFPS removed F.K. from the home. The next day, the District Court of Fayette County issued an emergency order provisionally finding that F.K.'s removal was necessary and naming TDFPS as F.K.'s temporary managing conservator and set a full adversary hearing for February 1, 2012. The court also appointed Defendant Laura Moore to serve as F.K.'s Court Appointed Special Advocate ("CASA"). After the full adversary hearing, the court issued a final order appointing TDFPS as F.K.'s temporary managing conservator. At the time of F.K.'s removal, Kalmus was pregnant with Burns's child, K.R.B.

In hopes of being reunited with F.K., Kalmus entered a "Family Plan of Service" specifying the requirements she needed to fulfill prior to reunification. Those requirements included

---

[2] Donna Kalmus is the mother of F.K. and K.R.B. Jarvis Deshawn Burns is K.R.B.'s father. However, Burns is neither the biological father nor the legal guardian of Plaintiff F.K.

completing protective parenting classes, participating in individual therapy, completing a drug and alcohol assessment, participating in random drug testing, and providing a safe and stable environment for herself and her daughter. TDFPS sought Burns's voluntary cooperation in the reunification process, but he refused to participate. Defendant Kelly Sandoval was assigned as F.K.'s case worker. She was responsible for visiting F.K. in foster care and ensuring her needs were met. She was also responsible for monitoring whether Kalmus was abiding by the terms of her Family Service Plan and engaging in services required by TDFPS.

On April 3, 2013, the Fayette County District Court ordered F.K. returned to her mother's home on a monitored basis. Under the Texas Family Code, when a child is returned home on a monitored basis, the child formally remains in TDFPS custody, but is monitored by a case worker as if they child were in foster care. While the child is at home on a monitored basis, TDFPS may remove the child from the home without seeking approval because TDFPS remains the child's temporary managing conservator and retains all the corresponding rights and duties, including the right to physical possession of the child. The court order placing F.K. on monitored return specifically stated that Burns was to have no contact with F.K. and was not allowed to visit Kalmus's residence, despite the fact that the at time Kalmus and Burns were living together on a property owned by Burns's parents in Washington County.

On April 9, 2013, F.K.'s special advocate, Defendant Moore, informed TDFPS that Burns, who was at the time on probation for drug charges, had tested positive for methamphetamine use and had executed an Admission of Use. TDFPS later learned that Burns had provided his probation officer with his parents' Washington County address as his home address. Both Sandoval and Moore independently visited F.K. at school and learned that she and her mother were living with Burns on a trailer on Burns's parents' property, where Burns's and Kalmus's infant child, K.R.B., also lived.

F.K. also told Moore that Burns had hit her mother with a belt and that her mother had hit Burns while he was driving their car.

F.K.'s case worker, Sandoval, discussed this new information with her supervisor, Defendant Zimmermann. In light of the revelation that F.K. was living with Burns, in violation of the order placing her on monitored return, Zimmermann instructed Sandoval to pick up F.K. from school and place her back in foster care. Out of concern for K.R.B.'s safety, Sandoval also notified Defendant Jessica Jackson, who works for TDFPS's investigative staff in Washington County about the infant's situation. Jackson and her supervisor, Defendant Karin Harbers, determined that the circumstances also warranted removing K.R.B. from the home.

On April 22, 2013, at approximately 2:30 p.m., Sandoval and Jackson arrived at the Washington County property where Kalmus, Burns, and the two children lived. Sandoval and Jackson were accompanied by F.K.'s special advocate, Defendant Moore, and law enforcement officers. (Zimmermann and Harbers, both TDFPS supervisors, did not accompany Sandoval, a case worker, and Jackson, an investigator, to the property.) Shortly after arriving, Sandoval and Jackson were greeted by Kalmus who was holding K.R.B. The two TDPFS employees explained that K.R.B. was being removed from the home and that, along with F.K., she would be placed in foster care. After leaving the property, Sandoval and Jackson picked F.K. up from school and placed the two children in the same foster home.

The next day, April 23, 2013, TDPFS filed an *ex parte* suit seeking a temporary court order that would give the Department custody over K.R.B. on an emergency basis. The County Court of Law of Washington County provisionally found that there would be a continuing danger to K.R.B.'s physical health or safety if she were to be returned to her parents, and, therefore, named TDFPS as K.R.B.'s temporary managing conservator and set a full adversary hearing for May 2, 2013. After the full adversary hearing, the court issued a second order naming TDFPS as K.R.B.'s temporary

4

managing conservator. Both Kalmus and Burns appeared at the adversary hearing, but neither were represented by counsel. Both parents were later appointed counsel, and, through counsel, moved the court to reconsider its decision to appoint TDFPS as K.R.B.'s temporary managing conservator. The court held a hearing on the motions for reconsideration and heard extensive testimony from the relevant parties. The court declined to dismiss TDFPS as K.R.B.'s temporary managing conservator. The court did, however, return K.R.B. to Kalmus, who was no longer living with Burns, on the condition that Burns not be allowed contact with K.R.B. The court made no findings as to the legality or propriety of the original decision to remove K.R.B. from her parents.

On April 21, 2015, Donna Kalmus and Jarvis DeShawn Burns filed this action, on behalf of themselves and their children, F.K. and K.R.B., naming Jeanette Zimmermann, Karin Harbers, Jessica Jackson, and Kelli Sandoval as Defendants in their individual capacities (collectively "TDFPS Defendants"). The action also names as a Defendant CASA worker Laura Moore. Against the TDFPS Defendants, Plaintiffs assert, pursuant to 42 U.S.C. § 1983, claims for violations of their Fourth Amendment right to be free from unreasonable searches and seizures, violations of their Fourteenth Amendment due process rights, and violations of their Fourteenth Amendment right to family integrity. Against Defendant Moore, Plaintiffs assert a common law negligence claim.

Defendant Moore has filed a motion to dismiss and a motion for summary judgment. The TDFPS Defendants have filed a motion for summary judgment. Additionally, Plaintiffs have filed a second motion to amend their complaint. All four motions are now ripe for review.

## II. Discussion

### A.  Plaintiff's Second Motion to Amend

The Court begins with Plaintiffs Second Motion for Leave to Amend Complaint, (Dkt. 42). Plaintiffs seek to voluntarily abandon several claims that they have determined are no longer viable. Specifically, Plaintiffs intend to dismiss their claims for violations of the right to family integrity as

well as all claims arising from the removal of F.K. Additionally, Plaintiffs seek to clarify that they are not asserting a claim for unlawful entry into Kalmus's or Burns's home. Plaintiffs do not seek to add new claims or modify the remaining claims.

Both the TDFPS Defendants and Defendant Moore oppose Plaintiffs' motion to amend and point out that the motion was filed nearly a year after the expiration of the amendment deadline. Defendants reject Plaintiffs contention that they have a right to amend without leave of the Court triggered by the filing of Defendant Moore's motion to dismiss. Rather, Defendants argue Plaintiffs must show good cause under Federal Rule of Civil Procedure 16(b)(4), or at the very least, are required to seek leave of the Court under Federal Rule of Civil Procedure 15(a)(2). Of course, Defendants are not opposed to Plaintiffs abandoning claims asserted against them. Their sole concern is that allowing Plaintiffs leave to amend will delay the litigation by (1) mooting the pending motions for summary judgment and (2) forcing Defendants to file responsive pleadings to the amended complaint. Plaintiffs, on the other hand, contends that allowing leave to amend will serve the litigation by providing a more clear and concise pleading.

This dispute is easily resolved. The Court grants Plaintiffs' Second Motion for Leave to Amend Complaint. All claims and causes of action not asserted in the Second Amended Complaint are dismissed with prejudice. All pleadings responsive to the First Amended Complaint are construed as responsive to the Second Amended Complaint.

## B.  Summary Judgment Standard

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court will view the summary judgment evidence in the light most favorable to the non-movant. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993). Once the movant carries its burden, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). The non-movant must respond to the motion by setting forth particular facts indicating there is a genuine issue for trial. *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000). The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). "After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Westphal*, 230 F. 3d at 174.

## C.  Defendant Moore's Motion for Summary Judgment

Plaintiffs assert claims for negligence against Defendant Laura Moore. Specifically, Plaintiffs argue that Moore acted tortiously when she reported to TDFPS that F.K. had stated she was living with Burns and that Burns had hit Kalmus. Plaintiffs contend that Moore's decision to relay this information to TDFPS, without conducting an independent investigation of F.K.'s assertion, breached her duties to Kalmus, Burns, K.R.B., and in particular, to F.K, for whom she served as a court appointed guardian ad litem.

Defendant Laura Moore filed both a Motion to Dismiss, (Dkt. 30), and a No Evidence Motion for Summary Judgment[3], (Dkt. 31), on the same day. The thrust of the two motions is the same. Moore argues that she did not have a duty to any of the Plaintiffs and, to the extent that she did have a duty, there is nothing in Plaintiffs' allegations or in the record to suggest she breached that duty. Plaintiffs respond substantively to Moore's motion for summary judgment, but simply object to the motion to dismiss as procedurally defective. Plaintiffs argue that any motion filed pursuant to Federal Rule of Civil Procedure 12(b)(6) must be filed before the party files its answer, and thus, Moore's motion to dismiss is untimely.[4] In light of the similarity between the two motions and Plaintiffs' procedural objections to the motion dismiss, the Court concludes it best to begin by addressing Moore's motion for summary judgment.

Under Texas law, a claim for negligence has three elements: (1) the existence of a legal duty owed by one person to another, (2) a breach of that duty, and (3) damages proximately caused by that breach. *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009).

The first question then is whether Moore owed any of the Plaintiffs a duty. Plaintiffs argue that Moore owed a general duty to Kalmus, Burns, F.K., and K.R.B., *see El Chico Corp. v. Poole*, 732 S.W.2d 306, 315 (Tex. 1987) ("The law of negligence . . . dictates every person is responsible for

---

[3] Technically, the Federal Rules of Civil Procedure do not recognize a no evidence motion for summary judgment: "Simply filing a summary judgment motion does not immediately compel the party opposing the motion to come forward with evidence demonstrating material issues of fact as to every element of its case. . . . [*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)] makes clear that before the non-moving party is required to produce evidence in opposition to the motion, the moving party must first satisfy its obligation of demonstrating that there are no factual issues warranting trial." *Russ v. International Paper Co.*, 943 F.2d 589, 592-93 (5th Cir. 1991). However, in *Celotex*, the Supreme Court is also clear that the party moving for summary judgment need not produce evidence to prove the lack of a factual dispute, rather "the burden on the moving party may be discharged by 'showing'—that is, pointing out . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325. Here, the Court is persuaded that Defendant Laura Moore has met this rather low burden and, thus, the burden shifts to Plaintiffs to demonstrate a genuine and material fact issue.

[4] Plaintiffs are correct. However, generally courts will construe an untimely motion made Federal Rule of Civil Procedure 12(b)(6) a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), which is subject to the same standard as a motion made under Rule 12(b)(6). *See Young v. City of Houston*, 599 F. App'x 553, 554 (5th Cir. 2015). Because here Defendant has also filed a valid motion for summary judgment, the Court sees no need to redominate her motion to dismiss.

injuries which are the reasonably foreseeable consequence of his act or omission."), and a specific fiduciary duty to F.K., *see Byrd v. Woodruff*, 891 S.W.2d 689, 706 (Tex. App.—Dallas 1994, writ dism'd by agr.) ("[A] guardian ad litem's court-appointed role to act as the representative of the minor's interests is sufficient to establish a fiduciary relationship between the minor and the guardian ad litem."). Assuming Plaintiffs are correct that under Texas common law Moore owed all four Plaintiffs a duty, that duty is circumscribed by statute. The Texas Family Code mandates that "[a] guardian ad litem . . . is not liable for civil damages arising from an action taken" unless the action (1) was taken "with conscious indifference or reckless disregard to the safety of another," (2) was made "in bad faith or with malice," or (3) was "grossly negligent or willfully wrongful." Tex. Fam. Code § 107.009(a)-(b). To prevail, Plaintiffs must demonstrate a genuine issue of material fact as to whether Moore violated one of the three heightened standards of care articulated in Texas Family Code § 107.009(b).[5]

In response to Moore's motion for summary judgment, Plaintiffs point principally to the affidavits submitted by the four TDFPS Defendants in support of their own motion for summary judgment. Plaintiffs also submit the affidavit of Donna Kalmus. According to Plaintiffs, the "best evidence" of Moore's negligence comes from the affidavits of the TDFPS Defendants:

> Their Declarations make it clear that the impetus for their decision to remove the Children was a report from Moore that Kalmus was violating a court order. Of course, when the dust settled, neither Moore nor the CPS Defendants ever developed any evidence that Kalmus violated the Fayette County District Court's Order as alleged by Moore. Because of the proof of Moore's involvement in the removal of the Children, Moore's Motion for Summary Judgment must fail.

---

[5] Plaintiffs acknowledge that Texas Family Code § 107.009 limits the liability of guardians ad litem, but suggest that Defendant Moore has waived this argument by failing to raise it in her motion. However, Plaintiffs do not cited suggesting the immunity provided by this section operates as an affirmative defense or otherwise is waived if not invoked. The Court reads the statute as narrowing the scope of causes of action preexisting in the common law, not creating a defense to those causes of actions. Accordingly, Plaintiffs claims must be consistent with the parameters set forth Texas Family Code § 107.009, even if Defendants motion fails to explicitly invoke the statute.

(Pls.' Resp. Def.'s No Evid. Mot. Summ. J., Dkt. 46 at 1-2). The only action of Moore's that Plaintiffs suggest constitutes a breach of duty is her failure to investigate F.K.'s assertion that she and her mother were living with Burns. (*See id.* at 10-11).

While a guardian ad litem arguably ought to make some attempt to corroborate the claims of a four year old before relaying them to authorities, it strains credulity to suggest that Moore's failure to investigate F.K.'s assertion that she was living with Burns violates one of the heightened standards of care set out in Texas Family Code § 107.009(b). First, Moore clearly did not act "with conscious indifference or reckless disregard to the safety of another." *Id.* Even by Plaintiffs' account the injury Moore risked was F.K. and K.R.B.'s removal from their home, an injury which does not implicate the safety of either the children or their parents. Next, there is no evidence that Moore acted "in bad faith or with malice." *Id.* Even if reporting F.K.'s statements without conducting an independent investigation was tortious conduct, there is no evidence in the record that Moore acted on any motivation other than to protect the safety of the children. Similarly, there is no reason to believe Moore's conduct was "grossly negligent or willfully wrongful," *id.*, as Plaintiffs have submitted no evidence of Moore's attitude or motivations. *See Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 922 (Tex. 1981) ("The essence of gross negligence is . . . the mental attitude of the defendant. . . . The plaintiff must show that the defendant was consciously, i.e., knowingly, indifferent to his rights.").

Accordingly, the Court concludes Plaintiffs have failed to demonstrate the existence of a genuine issue of material fact as to whether Moore's allegedly tortious conduct is exempt from the immunity provided by Texas Family Code § 107.009. Therefore, the Court concludes Moore's motion for summary judgment should be granted.

### D.  TFDPS Defendants' Motion for Summary Judgment

The Court now turns to Defendants Jeanette Zimmermann, Karin Harbers, Jessica Jackson, and Kelly Sandoval's Motion for Summary Judgment on the Basis of Qualified Immunity. In addition to arguing that they are entitled to qualified immunity, the TDFPS Defendants also argue that this Court should abstain from reviewing Plaintiffs' claims under the *Rooker-Feldman* a doctrine. Defendants Sandoval and Zimmermann also argue that they are not liable due to their limited involvement in K.R.B.'s case. The Court will first address the TDFPS Defendants evidentiary objections, then turn to their substantive arguments.

### 1.  Evidentiary Objections

The TDFPS Defendants object to several pieces of summary judgment evidence submitted by Plaintiffs. Most pertinently, Defendants object to the Court's consideration of the transcript of a hearing held in the County Court of Law of Washington County on motions for reconsideration filed by Burns and Kalmus asking the court to revisit its decision to appoint TDFPS as K.R.B.'s temporary managing conservator. In their response to the TDFPS Defendants' motion for summary judgment, Plaintiffs cite several passages of testimony given by Defendant Zimmermann at this hearing. Plaintiffs contend this testimony is probative of Zimmermann's involvement in the decision to remove K.R.B. from her parents.

Defendants argue that Zimmermann's prior testimony is inadmissible under Federal Rule of Evidence 804(b)(1). This rule creates an exception to the hearsay exclusion "if the declarant is unavailable as witness" for "[t]estimony that . . . was given as a witness at a trial, hearing, or lawful deposition . . . and . . . is now offered against a party who had . . . an opportunity and similar motive to develop it by direct, cross-, or redirect examination." Fed. R. Evid. 804(b)(1)(A)-(B). Defendants argue Zimmermann has not been shown to be unavailable and did not have a similar motive to develop her testimony at the state court hearing, and therefore, her prior testimony is inadmissible.

Defendants' argument is misguided. It is true that the admissibility of summary judgment evidence is subject to the same standards and rules that govern the admissibility of evidence at trial. *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 504 (5th Cir. 1999). However, the evidence need not be submitted in the same form as it would be presented at trial. For example, affidavits and deposition testimony are generally not admissible at trial because they constitute hearsay under Federal Rule of Evidence 802. Yet, affidavits and deposition testimony are allowed as summary judgment evidence, because the affiant or deponent can be called or subpoenaed as a witness at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."). Accordingly, a transcript of prior testimony, much like an affidavit or deposition testimony is permissible summary judgment evidence. *See O'Connor v. Williams*, 640 F. App'x 747, 750 (10th Cir. 2016) (affirming the consideration of prior testimony at a protective order hearing because summary judgment evidence does not need to be submitted in an admissible form so long as the substance of the evidence is admissible); *Williams v. Vasquez*, 62 F. App'x 686, 692 (7th Cir. 2003) ("[A]long with other courts, we have recognized that transcripts of testimony may be considered in support of, or opposition to, a motion for summary judgment."). Accordingly, the court overrules Defendants' objection to the Court's consideration of the transcript of the August 12, 2013 held in the County Court of Law of Washington County.

Defendants also object to an exhibit submitted by Plaintiffs referred to as "Gates Memorandum of August 22, 2008" and another exhibit referred to as "Excerpts from the Child Protective Services Handbook." The Court's ruling does not rely on either exhibit. Thus, the Court need not consider these objections.

2.   <u>Qualified Immunity</u>

All four TDFPS Defendants assert the defense of qualified immunity. The doctrine of qualified immunity protects government employees from civil liability as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court articulated a "two-step sequence for resolving government officials' qualified immunity claims." *Pearson v. Callahan*, 555 U.S 223, 232 (2009). "First, a court must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right." *Id.* "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* In *Saucier*, the Supreme Court required courts to first address whether Plaintiff had shown the violation of a right, before asking whether the right in question was clearly established. *Id.* The Court subsequently reconsidered and now courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Id.* at 236.

In addressing the first question—whether Plaintiffs have shown a violation of a constitutional right—"we employ currently applicable constitutional standards." *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004). In addressing the second—whether the right allegedly violated is "clearly established"—we ask whether "'[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* at 350 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The 'clearly established' standard does not mean that officials' conduct is protected by qualified immunity unless 'the very action in question has previously been held unlawful.'" *Id.* (quoting *Anderson*, 483 U.S. at 640). On the other hand, "an official does not lose qualified immunity merely because a certain right is clearly established in the

abstract." *Id.* Government officials are protected by qualified immunity "unless the law is clear in the more particularized sense that reasonable officials should be 'on notice that their conduct is unlawful.'" *Id.* (quoting *Saucier*, 533 U.S. at 206). A qualified immunity defense will fail "despite notable factual distinctions between the precedents relied on and the case the before the court, so long as the prior decisions gave *reasonable warning* that the conduct then at issue violated constitutional rights." *Hope v. Pelzer*, 536 U.S. 730, 740 (2002) (emphasis added).

"In the summary judgment context, a government official need only plead qualified immunity, which then shifts the burden to the plaintiff." *Gates v. Texas Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008). "The plaintiff must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct." *Id.*

a.   Qualified Immunity Step One

The first step in the qualified immunity inquiry is to determine whether the plaintiff has shown a violation of a constitutional right. Here, Plaintiffs assert claims for violations of both their Fourth Amendment right to be free from unlawful seizure and for violations of their Fourteenth Amendment right to due process.

The Fourth Amendment right to be free from unreasonable seizure is a personal right that belongs only to the individual whose person or belongings is subject to seizure. *See Alderman v. U.S.*, 394 U.S. 165, 174 (1969) ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted."). Plaintiffs' only remaining Fourth Amendment claim alleges that the removal of K.R.B. from her parents constitutes an unlawful seizure. If so, K.R.B. has a claim, but her parents do not, as they cannot assert K.R.B.'s Fourth Amendment rights on their own behalf. *See, e.g., P.C. v. Conn. Dep't of Children & Families*, 662 F. Supp. 2d 218, 232 (D. Conn. 2009) (holding, as a matter of law, that parents do not have a Fourth

Amendment right to be free from a child's removal and may bring Fourth Amendment claims only on the child's behalf). Thus, the only Plaintiff who has a plausible remaining Fourth Amendment claim is K.R.B., whose claims are brought by her parents, Plaintiffs Kalmus and Burns, as next friends.

Plaintiffs Kalmus and Burns do have viable claims for the violation of the Fourteenth Amendment right to due process. *See Gates*, 537 F.3d at 434 (5th Cir. 2008) (holding that "parents have a 'fundamental liberty interest . . . in the care, custody, and management of their child'" (quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982))). The Fifth Circuit has made clear that in cases where the plaintiffs bring both Fourth and Fourteenth Amendment claims relating to the seizure of a child, the protections afforded by the Fourth Amendment to the child mirror the protections afforded by the Fourteenth Amendment to the parents. *See id.* at 435 ("The procedures required for a constitutional search and seizure under the Fourth Amendment are adequate to protect [the parent plaintiffs'] procedural due process rights and liberty interests in directing the upbringing of their children."); *Wernecke v. Garcia*, 591 F.3d 386, 391 (5th Cir. 2009) ("In previous cases . . . premised upon the same underlying facts—the removal of children—the Fifth Circuit and other circuits have held that the procedures required for a constitutional search and seizure under the Fourth Amendment are adequate to protect the parents' procedural due process rights.").

Accordingly, the Court considers the Plaintiffs' Fourth and Fourteenth Amendment claims collectively and does so in reference to the governing Fourth Amendment case law. Plaintiffs argue that the TDFPS Defendants' decision to take K.R.B. from her mother without a court order violated K.R.B.'s Fourth Amendment right to be free from unreasonable seizure. The parties agree that the legality of the removal of K.R.B. is governed by two Fifth Circuit cases: *Gates v. Texas Dep't of Protective & Regulatory Servs.*, 537 F.3d 404 (5th Cir. 2008) and *Wernecke v. Garcia*, 591 F.3d 386 (5th Cir. 2009).

In *Gates*, social workers removed children from their home without a court order after investigating allegations of recent physical abuse by their father. *Gates*, 537 F.3d at 430. To determine whether the removal violated the Fourth Amendment rights of the children, the Fifth Circuit considered all of the information known to the social workers at the time the children were removed. *Id.* at 429. Among other evidence of abusive parenting, the court noted that one child displayed wounds that according to both the child and his siblings were inflicted by his father. *Id.* The court deemed the case a "close call," but ultimately concluded, given the totality of the circumstances, the social workers did not violate the Fourth Amendment by seizing the children without a court order. *Id.*

In reaching this conclusion, the Fifth Circuit articulated a framework for determining whether the seizure of a child violates the Fourth Amendment. "[T]he government may not seize a child from his or her parents absent a court order, parental consent, or exigent circumstances." *Id.* Exigent circumstances are present if, "based on the totality of the circumstances, there is reasonable cause to believe that the child is in imminent danger of physical or sexual abuse if he remains in his home." *Id.* Determining whether there is reasonable cause to believe the child is in imminent danger is a "flexible inquiry," but the Fifth Circuit enumerated six specific factors courts should consider: (1) "whether there was time to obtain a court order," (2) "the nature of the abuse (its severity, duration, and frequency)," (3) "the strength of the evidence supporting the allegations of abuse," (4) "the risk that the parent will flee with the child," (5) "the possibility of less extreme solutions to the problem," and (6) "any harm to the child that might result from the removal." *Id.*

In *Wernecke*, the Fifth Circuit applied this framework to a case where two boys were removed by social workers from their parents' home and placed in state custody because their home was not deemed a safe place for children to live. *Wernecke*, 591 F.3d at 398-401. The parties disputed the exact state of the home. *Id.* at 398-99. According to the plaintiffs it was merely cluttered, while

according to the defendants it was extremely unsanitary, with medications, syringes, and feces scattered about. *Id.* at 398. The Fifth Circuit applied the six factors articulated in *Gates* and concluded that "[i]n the light most favorable to the Werneckes, a reasonable person would not believe that an immediate danger would be posed by [the children] remaining in the home." *Id.* at 399. Moreover, the court concluded that "the essentials of what [is] required . . . for a social worker to effect a warrantless seizure," namely the requirement of "at the very least, some evidence of imminent danger to child," were clearly established, even prior to the Fifth Circuit's decision in *Gates*. *Id.* at 400.

 Here, the TDFPS Defendants offer two arguments as to why they reasonably believed the removal of K.R.B. was necessary due to exigent circumstances. First, F.K. had reported that she and her mother were again living with Burns, contrary to what Kalmus had told TDFPS and in violation of an order entered by the Fayette County District Court. In light of Burns's history of spousal abuse and drug use, the TDFPS Defendants argue, they reasonably concluded it was unsafe for K.R.B. to reside with him. This concern was compounded by the fact that TDFPS had recently learned from Burns's probation officer that he had tested positive for methamphetamines. However, Defendants must do more than demonstrate general concerns about K.R.B.'s welfare—they must show they reasonably perceived an *imminent threat of physical abuse*. The evidence Defendants present suggesting that K.R.B.'s father used methamphetamines and had some history of abuse is troubling, but does not demonstrate that K.R.B. was in immediate danger.

 Moreover, the Court notes that while the Fayette County District Court had previously ordered that Kalmus and F.K. not reside with Burns, no such order was in place with regard to K.R.B. Burns is K.R.B.'s biological father and at the time of K.R.B.'s removal TDFPS had made no effort to strip him of the rights incident to fatherhood. In this context, some of the arguments made by the TDFPS Defendants are puzzling. For example, the TDFPS Defendants repeatedly remind

the Court that F.K. had informed them that "Burns fed K.R.B. her bottle 'all the time.'" (Defs.' Mot. Summ. J., Dkt. 33 at 7). On this point, the Court agrees with Plaintiffs that a father feeding his child is not evidence of an imminent threat of physical abuse.

Second, Defendants argue F.K. "made an outcry of domestic violence" to her CASA worker, Defendant Laura Moore, which was then relayed to them. (Defs.' Mot. Summ. J., Dkt. 33 at 8). The TDFPS Defendants provide inconsistent accounts of what Moore told them F.K. had said. In her declaration, Defendant Jeanette Zimmermann states that "Ms. Moore . . . advised that F.K. had . . . told her that Mr. Burns lived at home," but makes no mention of Moore relaying an outcry of abuse.  (Zimmermann Decl. ¶ 12, Dkt. 33-2 at 4). Defendant Kelli Sandoval attests that Moore conveyed that F.K. had said "that Mr. Burns hit Ms. Kalmus with a belt and that Ms. Kalmus had hit Mr. Burns when he was driving their car," but makes no mention of Moore relaying that Burns had abused F.K. (Sandoval Decl. ¶ 15, Dkt. 33-1 at 4). Sandoval's declaration is consistent with the report she submitted to the Fayette County District Court. (*See* Report to the Court, Dkt. 34-10 at 1). Defendants Karin Harbers and Jessica Jackson, on the other hand, both attest they heard, without specifying from whom, "F.K. had made an outcry of domestic violence between Ms. Kalmus and Mr. Burns as well as physical abuse of herself." (Harbers Decl. ¶ 12, Dkt. 33-3 at 3; Decl. Jackson Decl. ¶ 12, Dkt. 33-4 at 3). Notably, when Harbers testified in state court she was asked to explain the basis for the removal of K.R.B. from her home and she responded in full, "There were concerns about the state of the home that Ms. Kalmus was residing in, as well as concerns about whether or not Mr. Burns was actually at the residence." (Tr. Mot. Reconsideration 53:4-9, Dkt. 43-5 at 53). In her testimony, Harbers did not mention an outcry of abuse.

The Court is required to construe the evidence in the most favorable to Plaintiffs and therefore assumes F.K.'s outcry of abuse was limited to report her parents hitting each other, as stated in Sandoval's declaration and her report to the Fayette County District Court. The Court finds

that evidence of a limited incident of abuse between Kalmus and Burns is not evidence that K.R.B. faced an imminent threat of physical abuse.

The Court now assesses this evidence in light of the six factors articulated by the Fifth Circuit in *Gates*. First, the TDFPS Defendants have not presented evidence that they were unable to obtain a court order. In their motion, the TDFPS Defendants assert that "obtaining a court order was not feasible on April 22, 2013 (Monday)." (Defs.' Mot. Summ. J., Dkt. 33 at 17). However, they provide no evidence or explanation to substantiate this assertion. Second, any assessment of the nature of the abuse, including its severity, duration and frequency, counsels against finding the presence of exigent circumstances. In fact, there is no evidence in the record that K.R.B. has ever been abused. While there is evidence that F.K. reported spousal abuse on the part of her parents, this allegation appears limited to one or two isolated incidents of hitting. Third, an assessment of the strength of the evidence supporting the allegations of abuse also clearly counsels against finding the presence of exigent circumstances. The TDFPS Defendants acted based on the vague, uncorroborated assertions of a four year old that were relayed to them through a third party. Fourth, there is no evidence in the record that either parent was likely to flee with K.R.B. Neither party has submitted evidence specifically relevant to the fifth and six factors, but the Court believes it fair to assume there were at least some less drastic remedial measures available to TDFPS and that K.R.B. suffered some harm from being taken away from her family and placed in state custody.

Having reviewed all of the evidence and construed it in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have shown the presence of fact issues as to whether the TDFPS Defendants reasonably believed K.R.B. faced an imminent threat of physical abuse. Accordingly, Plaintiffs have sufficiently demonstrated a violation of K.R.B.'s Fourth Amendment right to be free from unreasonable seizures to overcome summary judgment.

b.  Qualified Immunity Step Two

The second step in the qualified immunity inquiry is to determine whether the right in question was clearly established at the time of the defendant's unconstitutional conduct. The Fifth Circuit's opinion in *Wernecke* is instructive on this front. In that case, the court determined the rule that seizure of a child requires evidence to imminent danger was clearly established even before the Fifth Circuit's opinion in *Gates*:

> The *Gates* decision articulated a standard for determining when some evidence of danger rises to the level of an emergency justifying immediate removal, but *Gates* was not the first case to require, at a minimum, some evidence of imminent danger prior to removal. [Previous cases] clearly established that, at the very least, some evidence of imminent danger to a child was required to justify a warrantless seizure. . . . While . . . *Gates* gives additional guidance to social workers, the essentials of what was required in June 2005 for a social worker to effect a warrantless seizure . . . were clear. . . . . Fifth Circuit law clearly established in June 2005 that a warrantless seizure of [a child]—in the absence of any imminent danger—was a constitutional violation.

*Wernecke*, 591 F.3d 386 at 400 (internal citations omitted). If the defendants in *Wernecke* were expected to understand that warrantless seizure of a child requires the presence of an imminent threat, then clearly the TDFPS Defendants should be held to the same standard. This is particularly true given that the Defendants here have the benefit of substantial case law, including the Fifth Circuit's decisions in *Gates* and *Wernecke*, that were not available to the *Wernecke* defendants. Therefore, the TDFPS Defendants are not entitled to qualified immunity on Plaintiffs' claim that they unlawfully seized K.R.B.

3.  Liability of Defendants Sandoval and Zimmermann

Defendants Kelli Sandoval and Jeanette Zimmerman argue that they were not involved in the decision to remove K.R.B. and therefore, even if not entitled to qualified immunity, are not liable for any claim arising from K.R.B.'s removal. Defendants Sandoval and Zimmermann were at the time of K.R.B.'s removal employed by TDFPS's conservatorship unit and, thus, were primarily involved in the case due to TDFPS's role as F.K.'s temporary managing conservator. In contrast,

Defendants Jackson and Harbers were employed by TDFPS's investigative unit and, at least in a nominal sense, were responsible for making the decision to remove K.R.B., who at the time was not in TDFPS's custody. Nonetheless, Plaintiffs argue that both Sandoval and Zimmermann effectively participated in the decision to remove K.R.B.

An official "may be held liable under § 1983 only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Gates*, 537 F.3d at 435 (quoting *Baker v. Putnal*, 75 F.3d 190, 199 (5th Cir. 1996)). "Ordinarily, supervisors may not be held vicariously liable for constitutional violations committed by subordinate employees." *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 254 (5th Cir. 2005). "However, supervisors may be liable . . . when supervisors act, or fail to act, with *deliberate indifference* to violations of others' constitutional rights committed by their subordinates." *Id.*

Plaintiffs point out that Sandoval, by all accounts, was at Kalmus's residence, with Defendants Jackson and Harbers, when K.R.B. was removed. (Sandoval Decl. ¶ 17, Dkt. 33-1 at 4-5). In Kalmus's declaration, she states "Defendants Sandoval, Jackson and Moore loaded K.R.B. into Sandoval's car" and "Sandoval left with K.R.B." (Kalmus Decl. ¶ 6, Dkt. 43-1 at 1). Thus, the Court easily concludes Plaintiffs have demonstrated the existence of a genuine issue of material fact as to whether Defendant Sandoval affirmatively participated in the removal of K.R.B.

Zimmermann was not present when K.R.B. was removed, but was involved in her capacity as Sandoval's supervisor. Plaintiffs point to some evidence indicating that Sandoval was involved in the process of assessing K.R.B.'s wellbeing and determining what actions, if any, TDFPS should take to protect K.R.B. Zimmermann testified before the County Court of Law of Washington County that she had been involved with Kalmus and both "her children." (Tr. Mot. Reconsideration 39:9-11, Dkt. 43-5 at 39). She also testified she had observed Kalmus and K.R.B. together a handful of

times and offered opinions about Kalmus's treatment of K.R.B., including that K.RB. "was dressed appropriately" and that Kalmus was "really diligent" about seeing to K.R.B.'s medical needs. (*Id.* at 48:15-24). When asked why K.R.B. was not removed from Kalmus as soon as she was born, Sandoval testified, "That's correct. *We* made a mistake." (*Id.* at 41:8-18) (emphasis added). Moreover, in her own declaration, Zimmmermann explains at length how a social worker in TDFPS's conservatorship unit is regularly "required to seek approval from his or her supervisor for certain decisions and actions during a case." (Zimmermann Decl. ¶ 4, Dkt. 33-2 at 2). In light of the evidence submitted suggesting Sandoval, Zimmmermann's subordinate, participated directly in K.R.B.'s removal, it is reasonable to infer, given Zimmermann's supervisory responsibilities, she played some role in the decision to remove K.R.B. While this evidence is not overwhelming, the Court concludes it is sufficient to establish a fact issue as to whether Zimmermann acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs.

### 4. *Rooker-Feldman* Abstention

Finally, the TDFPS Defendants argue that this action is barred the *Rooker-Feldman* abstention doctrine. The *Rooker-Feldman* doctrine "directs that federal district courts lack jurisdiction to entertain collateral attacks on state court judgments." *Saloom v. Tex. Dep't of Family & Child Protective Servs.*, 578 F. App'x 426, 428–29 (5th Cir. 2014) (quoting *Liedtke v. State Bar of Tex.*, 18 F.3d 315, 317 (5th Cir. 1994)). The doctrine "is 'narrow' and only applies when the plaintiff seeks the 'review and rejection' of a state court judgment." *Id.* (quoting *Exxon Mobil Corp. v. Saudi Basic. Indus. Corp.*, 544 U.S. 280, 284 (2005)). Moreover, "[a] federal lawsuit is not barred if the alleged injuries were caused by the defendants' actions rather than by the state court judgment, even if the defendants' actions led to the state court judgment." *Id.*

The *Rooker-Feldman* doctrine is inapplicable here for two reasons. First, the state court overseeing the suit affecting the parent-child relationship with regard to K.R.B. never entered a

judgment. TDFPS voluntarily dismissed the suit and K.R.B. has been returned to Kalmus. Accordingly, there is no state judgment for Plaintiffs to challenge. Second, the state court action and this federal action involve distinct issues. The state court's intermediary orders pertain to the question of whether TDFPS had the right to prospectively retain custody of K.R.B. under the terms of the Texas Family Code. This lawsuit involves the separate question of whether the initial decision to seize K.R.B. without a warrant is consistent with the Fourth and Fourteenth Amendments. Accordingly, this action does not seek to vacate an order of the state court, even if the two actions involve similar legal standards and overlapping factual issues. *See Thomas v. Tex. Dep't of Family & Protective Servs.*, 427 F. App'x 309, 313 (5th Cir. 2011) ("We cannot accept . . . [this ]suit is merely an attempt to shoehorn a parent-child relations dispute that is pending in state court into a civil rights complaint. . . . Appellants have made claims asserting federal constitutional violations, and seek monetary relief and injunctive relief to prevent further allegedly unconstitutional searches and seizures. The mere fact that the underlying dispute arose from an issue concerning a parent—child relationship does not destroy a federal court's jurisdiction over a properly pleaded constitutional claim.").

The Fifth Circuit's holding in *Saloom v. Texas Department of Family & Child Protective Services* is dispositive on this point:

> Here, [the plaintiff] does not seek the review or rejection of the state court's custody order in the amended complaint. Instead, she challenges the actions taken by the defendants before the state court entered any orders, such as the defendants' initial non-judicial seizure of her son . . . . [She] seeks damages for injuries caused by the defendants' actions rather than by the state court judgment. . . .The lawsuit is not barred simply because the defendants' actions allegedly led to the state court judgment. Therefore, the district court should not have found that [her] suit was barred by the *Rooker–Feldman* doctrine.

578 F. App'x 426, 429 (5th Cir. 2014) (internal citations omitted).

The Court therefore concludes TDFPS Defendants' motion for summary judgment should be denied.

## IV. Conclusion

Plaintiffs' Second Motion for Leave to Amend Complaint (Dkt. 42) is hereby **GRANTED.** All claims and causes of action not asserted in the Second Amended Complaint are dismissed with prejudice. All pleadings responsive to the First Amended Complaint are construed as responsive to the Second Amended Complaint.

Defendant Laura Moore's No Evidence Motion for Summary Judgment (Dkt. 31) is hereby **GRANTED.** Defendant Laura Moore' Motion to Dismiss (Dkt. 30) is hereby **DISMISSED AS MOOT.**

Defendants Jeanette Zimmermann, Karin Harbers, Jessica Jackson, and Kelly Sandoval's Motion for Summary Judgment on the Basis of Qualified Immunity is hereby **DENIED.**

**SIGNED** on November 1, 2016.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE